[Cite as *In re A.B.*, 2021-Ohio-4273.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE:  A.B.                  :         APPEAL NO. C-210010
                                         TRIAL NO. 20-1668Z

                                     :

                                     :         *O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  December 8, 2021

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, *Andrew Hakala-Finch*, Assistant Public Defender, and *Jessica Moss*, Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1} A.B. appeals the juvenile court's order of restitution, arguing that the juvenile court abused its discretion in ordering A.B. to pay restitution because the amount of restitution ordered does not bear a reasonable relationship to the actual loss suffered. For the following reasons, we affirm the judgment of the juvenile court.

## Procedural History

{¶2} On April 10, 2020, a complaint was filed alleging that A.B. was delinquent for committing felonious assault on or about April 8, 2020, in violation of R.C. 2903.11(A), a felony of the second degree if committed by an adult. A.B. subsequently entered a plea of admit as charged in exchange for the state not seeking a serious-youthful-offender indictment and was adjudicated delinquent on September 9, 2020. The juvenile court committed A.B. to the legal custody of the Department of Youth Services for an indefinite term, consisting of a minimum of one year and a maximum period not to exceed A.B.'s twenty-first birthday. A separate hearing was held on November 30, 2020, to determine restitution and the juvenile court ordered that A.B. pay $19,485.45 in restitution.

## Factual Background

{¶3} The victim of the underlying assault was Jerry Bryant. At the restitution hearing, the state called Karen Bryant, the mother of Jerry Bryant ("mother"), to testify.

### Testimony of Karen Bryant

{¶4} Mother testified that Jerry was transported by ambulance to Mercy Hospital as a result of the events that took place on April 8, 2020. She stated:

At Mercy Hospital they put the tube in his chest. They did a bunch of x-rays, MRI, blood work, and different other things. He sat there for about five hours.

I would say around 8:30 that night is when they transported him to UC, and at UC, from where his nose got [sic] broke and got busted open right here, they had to go up in there and refix his nose and put seven stitches across the bridge of his nose.

He was -- I could not see him because of the COVID virus. They had [sic] called me later on that night, and they had told me that he was -- they had to do another procedure because he was choking on his own blood.

* * *

He was there from April 8th until April 12th, or it might have been April 13th. I would call every hour on the hour -- I know they were getting aggravated with me and everything -- just to find out how my son was because they told me he was in critical condition. That's the only son I have, and I didn't know whether he was going to live or die that day.

{¶5} Jerry did not have medical insurance. Jerry came to stay with mother when he was released. Since then, they received medical bills in the mail in Jerry's name. When asked if the medical bills had been paid, mother responded, "No, I can't pay these bills." Seven medical bills were admitted into evidence. Mother testified that all the bills were incurred because of the incident on April 8, 2020. She was not aware of any further discounts or reductions in the medical bills she received. To her knowledge, none of the bills had changed and no further negotiations had taken

3

place with any of the medical providers. Jerry applied to the Victims of Crime Relief Fund but was told that nothing would be paid.

*Medical Bills*

{¶6}    State's exhibit 1 is a medical bill, dated April 13, 2020, from Mercy Health, which reflects an amount due of $13,127.88. The amount reflected includes a "self-pay discount (uninsured)" in the amount of $8,751.92. State's exhibit 2 is a medical bill, dated April 13, 2020, from Mercy Health Physicians reflecting an amount due of $10.80. The amount reflected includes an "adjustment" of $7.20. State's exhibit 3 is a medical bill, dated April 22, 2020, from US Acute Care Solutions, which reflects an amount due of $3.353.52. State's exhibit 4 is a medical bill, dated May 15, 2020, from Columbus Radiology, which reflects an amount due of $1,950. The amount reflected includes an adjustment of $1,478. State's exhibit 5 is a medical bill, dated April 16, 2020, from Southern Ohio Pathology Consultants, which reflects an amount due of $24. The reflected amount includes a "self-pay discount writeoff [sic]-credit" of $56. State's exhibit 6 is a medical bill, dated April 17, 2020, from First Care reflecting an amount due of $359.25. This reflected amount includes two "negotiated discounts" in the amounts of $782.95 and $77.20. State's exhibit 7 is a medical bill, dated April 14, 2020, from "City of Springfield FD," which reflects an amount due of $660.

*Decision of the Juvenile Court*

{¶7}    The state requested $19,485.45 in restitution, the total amount of all seven medical bills. The trial court found that each bill was a medical treatment or service provided as a result of the criminal act for which A.B. and his brother had been adjudicated delinquent, the bills supported Jerry's economic losses, and the amount requested was supported by the documents and evidence accepted as

4

exhibits for the purposes of the restitution hearing. Accordingly, the juvenile court found that the amount of restitution requested was supported by competent, credible evidence. The court then stated:

> Now, the problem that we have is if there is [sic] further discounts being provided through an uninsured discount. We see on state's exhibit #1 that there's a substantial discount provided. So in the event there is discounts provided for the medical services, then the restitution amount would be reduced, okay? But as of now, I'll do an exact total, but it's roughly $19,485.45, okay, until we get a calculator to total them up. All right. That will be on the record. Anything else from anyone? That will be jointly and severally, which means you're both responsible for the total amount individually. But if one or the other is making payments and it's split equally between you and your brother, then that can be done that way, too, okay? Or a third or two-thirds, however it may be paid off, all right? All right. So that concludes the restitution hearing.
>
> * * *
>
> Well, I'm going to leave that to the responsibility of the Bryants to bring forward information to the prosecutor's office if you're receiving a discount. They can provide that information so that we can put it in by an Entry to make the reduction. But, as of this point, this is what we have to go by, and it appears from her testimony that this is what they're responsible for or her son's responsible for. Okay? All right. Thank you.

5

## Law and Analysis

{¶8} In his sole assignment of error, A.B. argues that the juvenile court abused its discretion in ordering A.B. to pay restitution because the amount of restitution ordered does not bear a reasonable relationship to the actual loss suffered. "A decision to award restitution lies within the sound discretion of a juvenile court and will not be reversed on appeal absent an abuse of discretion." *In re M.N.*, 2017-Ohio-7302, 96 N.E.3d 980, ¶ 8 (1st Dist.), citing *In re M.A.*, 2016-Ohio-1161, 61 N.E.3d 630, ¶ 12 (11th Dist.). "There must be competent and credible evidence in the record from which the court may ascertain the amount of restitution to a reasonable degree of certainty." *Id.*, citing *State v. Seele*, 6th Dist. Sandusky No. S-13-025, 2014-Ohio-1455, ¶ 9. "A trial court abuses its discretion by ordering restitution in an amount that does not bear a reasonable relationship to the actual loss suffered." (Citations omitted.) *Id.*

{¶9} If a child is adjudicated a delinquent child, for an act that would not be a minor misdemeanor if committed by an adult, the juvenile court may require the child to make restitution to the victim of the child's delinquent act in an amount based upon the victim's economic loss caused by or related to the delinquent act. R.C. 2152.20(A)(3). "If the court requires restitution under this division, the restitution shall be made directly to the victim in open court or to the probation department that serves the jurisdiction or the clerk of courts on behalf of the victim." *Id.*

> If the court requires restitution under this division, the court may base the restitution order on an amount recommended by the victim or survivor of the victim, the delinquent child, the juvenile traffic offender, a presentence investigation report, estimates or

receipts indicating the cost of repairing or replacing property, and any other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the delinquent act or juvenile traffic offense. If the court decides to order restitution under this division and the amount of the restitution is disputed by the victim or survivor or by the delinquent child or juvenile traffic offender, the court shall hold a hearing on the restitution. If the court requires restitution under this division, the court shall determine, or order the determination of, the amount of restitution to be paid by the delinquent child or juvenile traffic offender.

*Id*. "The court may hold a hearing if necessary to determine whether a child is able to pay a sanction under this section." R.C. 2152.20(C).

'Economic loss' means any economic detriment suffered by a victim of a delinquent act or juvenile traffic offense as a direct and proximate result of the delinquent act or juvenile traffic offense and includes any loss of income due to lost time at work because of any injury caused by the victim and any property loss, medical cost, or funeral expenses incurred as a result of the delinquent act * * *. 'Economic loss' does not include non-economic loss of any punitive or exemplary damages.

R.C. 2152.02(K).

{¶10} A.B. argues that the trial court abused its discretion because unverified, seven-month-old hospital bills are insufficient to show actual economic loss where there is a stated intention not to pay the medical bills. In support of this

contention, A.B. cites to this court's decision in *State v. Purnell*, 171 Ohio App.3d 446, 2006-Ohio-6160, 871 N.E.2d 613 (1st Dist.).

{¶11} *Purnell* concerned a challenge to a trial court's postsentence order increasing the amount of restitution to be paid to the victim from $7500 to $38,232.74. *Id.* at ¶ 1. The appellant challenged the order on two grounds: whether the trial court had jurisdiction to increase restitution postsentence and whether there was sufficient evidence of economic loss to support the order of restitution. *Id.* At the restitution hearing, two months after sentencing occurred, the victim testified and tendered hospital and medical bills, "that were unverified as to the amount actually owed." *Id.* at ¶ 3. This court found that the record contained, "no credible evidence of economic loss beyond the unauthenticated hospital and medical bills." *Id.* at ¶ 16. Further, we stated:

> The victim, whose cooperation with the prosecutor and the probation department appears from the record to have been, at the very least, questionable, did not tender these exhibits to the trial court until the December 29, 2005 hearing. They may have reflected the amounts that were billed, but without some verification as to what [the victim] actually owed or paid, they did not substantiate Early's out-of-pocket loss. Because R.C. 2929.18(A)(1) states that the trial court's order of restitution 'shall not exceed the amount of economic loss suffered by the victim as a direct and proximate result of the commission of the offense,' the trial court had no evidentiary basis to increase the award.

*Id.*[1] Thus, it is apparent that there were concerns with the victim's credibility. *See id.*

{¶12} *Purnell* stands for the proposition that medical bills *alone*, without other competent, credible corroborating evidence to support that the bill amounts are the actual amounts owed, are insufficient to prove economic loss. *See Purnell*, 171 Ohio App.3d 446, 2006-Ohio-6160, 871 N.E.2d 613, at ¶ 16. For example, it has been held that "unauthenticated" records, coupled with victim testimony of the amount owed, are sufficient to establish the amount of economic loss to a reasonable degree of certainty. *See State v. Dennis*, 4th Dist. Highland No. 13CA6, 2013-Ohio-5633, ¶ 11, citing *State v. Riley*, 184 Ohio App.3d 211, 2009-Ohio-3227, 920 N.E.2d 388, ¶ 22, and *In re Hatfield*, 4th Dist. Lawrence No. 03CA14, 2003-Ohio-5404, ¶ 9. This is not to say that victim testimony is always required under R.C. 2152.20(A)(3); the loss may be shown through documentary evidence or testimony alone so long as it is competent evidence to show economic loss. *See In re J.G.*, 3d Dist. Logan No. 8-20-59, 2021-Ohio-1624, ¶ 47; *State v. Jones*, 10th Dist. Franklin No. 14AP-80, 2014-Ohio-3740, ¶ 23. However, the evidence presented must "take account of any offsets to the victim's economic loss and any mitigation of damages in the form of compensation received for the loss from, for example, insurance * * *." *State v. Bowman*, 181 Ohio App.3d 407, 2009-Ohio-1281, 909 N.E.2d 170 (2d Dist.). Accordingly, medical bills, plus some other form of competent evidence to illustrate or address any potential offsets to the victim's economic loss, would be sufficient evidence to prove a victim's economic loss.

---

[1] R.C. 2929.18 is the parallel provision to R.C. 2152.20, which addresses permissible financial sanctions for adult offenders.

{¶13}  Here, the victim's mother testified that she received the bills entered as evidence in the mail at her house, where Jerry also lives.  When asked about other potential discounts or write offs, her testimony was as follows:

Question: The bill from Mercy Health, [$]1,3127.80, it indicates on it that there was a self-pay discount.  So that bill was initially larger than that, and then it was reduced.  Are any of the other – did you receive any sort of discount subsequent to – because most of these statements are from April of this year.  Have any of these bills been reduced because your son was uninsured that you're aware of?

Mother: Not as I'm aware of if they have been, but that's what we got through the mail.

Question: And so, to your knowledge, none of these amounts have changed?

Mother: No.

* * *

Question: So these are the only bills that you've received?

Mother: So far, yes.

Question: Okay.  And, as [previously] indicated on Mercy Health, it looks like there was $8,751.92 discount.  Is that correct?

Mother: To my knowledge, yeah, I guess, but everything you're seeing on that paperwork, that's what was sent to me.

Question: What has actually been paid?

Mother: I haven't paid anything.  I'm not able to.

Question:     Are these bills in your name or Jerry's name?

Mother:       They're in Jerry's name.

Question:     And Jerry hasn't paid anything either?

Mother:       No.  Why should he?  He didn't do it to himself.

* * *

Question:     Has any further negotiation taken place with any of these healthcare providers?

Mother:       Not as I know of.

{¶14} Thus, here we have medical bills coupled with testimony from the victim's mother regarding the amount owed on the bills.  Consequently, the question becomes whether mother's testimony was credible corroborating evidence to establish that the amount stated in the bills was the actual amount that Jerry, an adult, owed.  While there is nothing in the record to verify whether mother is the one responsible for Jerry's bills or whether mother would have any control over the bills, the record does reflect that Jerry has special needs, reads at a second-grade level, and was living with mother.

{¶15} R.C. 2152.20(A)(3) provides that the court may base the restitution amount on "any other information, provided that the amount the court orders as restitution shall not exceed the amount of economic loss suffered by the victim." Notably, the permissible evidence is not limited to only victim testimony. *See* R.C. 2152.20(A)(3).  Mother testified that the bills admitted into evidence were the only bills received at her house, where Jerry also lives, and that, to her knowledge, no other changes had been made to the amount Jerry owed.  Mother also testified that Jerry did not have insurance.  It is apparent that the trial court found mother's testimony to be credible regarding the amount owed on the medical bills.  The trial

11

court was in the best position to determine whether mother was credible and whether her testimony supported a restitution award of the amount reflected in the medical bills. *See State v. Johnson*, 1st Dist. Hamilton No. C-100702, 2011-Ohio-5913, ¶ 8 ("The trial court was in the best position to determine whether Goldston was credible and whether her testimony was supported a restitution award of $11,400."); *State v. Geldrich*, 12th Dist. Warren No. CA2015-11-103, 2016-Ohio-3400, ¶ 10; *In re Hatfield*, 4th Dist. Lawrence No. 03CA14, 2003-Ohio-5404, ¶ 10. Therefore, given that mother's testimony supported the amount reflected in the medical bills as the actual amount owed, we cannot say the trial court abused its discretion when ordering restation for the total amount reflected as owed on the medical bills. Accordingly, we overrule this assignment of error.

## Conclusion

{¶16} Having overruled the sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**MYERS** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.